## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 13-CR-00083** |
| | : | |
| **DAVID THOMAS MATUSIEWICZ,** | : | |
| **LENORE MATUSIEWICZ, and** | : | |
| **AMY GONZALEZ,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                   **MARCH 10, 2015**

### MEMORANDUM

This is a prosecution for conspiracy and cyberstalking arising out of the murder of

Christine Belford at the hands of her father-in-law, Thomas Matusiewicz, on February 11, 2013,

in the lobby of the New Castle County Courthouse. The matter was originally assigned to the

Hon. Gregory Sleet, who presided until revelations during the course of further investigation

caused him to recuse himself. The recusal lead to reassignment of this matter to a judge outside

the District of Delaware.

As might be expected, the courthouse shooting of a young mother of three children led to

a significant amount of media coverage, which in turn led all three Defendants to move for a

change of venue pursuant to Federal Rule of Criminal Procedure 21(a). In a memorandum and

accompanying order issued on May 29, 2014, Judge Sleet analyzed the Defendants' assertion of

"presumed prejudice" according to the factors set forth in Skilling v. United States, 561 U.S.

358, 382-85 (2010), and concluded that "the Defendants have not established that media

coverage of this case has so prejudiced potential jurors that the court should presume it is

impossible for the Defendants to receive a fair trial in the District of Delaware." ECF 94 at 9.

1

When analyzing presumed prejudice in Skilling—a case that arose out of the collapse of the energy company Enron—the Supreme Court looked to: (1) the size and characteristics of the community in which the crime occurred; (2) the content of the media coverage; (3) the timing of the media coverage; and (4) the existence of media interference with court proceedings. 561 U.S. at 382-84. Judge Sleet systematically analyzed the pretrial publicity under Skilling and made the following determinations: (1) "the size and characteristics of the District of Delaware mitigate any prejudice against the Defendants that may exist"; (2) "the news coverage here is simply not the sort that courts have found grossly skewed, hyperbolic, or otherwise prejudicial"; (3) "[i]n the absence of evidence that a high level of media interest had continued since the shootings, . . . a period of more than a year is a sufficient cooling off period"; and (4) "Defendants do not present any credible evidence that [media] interference has occurred here . . . ." ECF 94 at 4-9.

Defendants have now submitted supplemental briefing on the issue of venue in reliance on a new development in the case—specifically, the allegation by the government that a "hit list" was found which contains the names of the decedent, Judge Sleet, and other leading members of the Delaware community.[1] This was the revelation that resulted in Judge Sleet's recusal.

I will address the supplemental briefing as renewed Motions to Transfer Venue. The threshold question is the applicable standard of review. I have concluded, and during oral argument the Parties agreed, that I may not approach the issue *de novo*, but rather must treat the supplemental submissions as a motion for reconsideration.

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."

---

[1] The defense vigorously contests the existence of a "hit list," pointing out, among other things, that the government's position depends upon its interpretation of an abbreviation, "H. L.," at the top of the document.

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (quoting Arizona v.

California, 460 U.S. 605, 618 (1983)). Consequently, "[w]here a successor judge is asked by

timely and proper motion to reconsider the legal conclusions of an unavailable predecessor, he or

she is empowered to reconsider those issues *to the same extent* that his or her predecessor could

have." U. S. Gypsum Co. v. Schiavo Bros., 668 F.2d 172, 176 (3d Cir. 1981) (emphasis added).

The Third Circuit has specifically addressed the power of a successor judge in the context of

venue, and held that judges of co-ordinate jurisdiction should not overrule each other's decisions:

> Adherence to law of the case principles is even more important in this context
> where the transferor judge and the transferee judge are not members of the same
> court. Here, the principles of comity among courts of the same level of the federal
> system provide a further reason why the transferee court should not independently
> re-examine an issue already decided by a court of equal authority. See Hoffman v.
> Blaski, 363 U.S. 335, 348-49, 80 S.Ct. 1084, 1092, 4 L.Ed.2d 1254 (1960)
> (Frankfurter, J., dissenting); Chicago & N.W. Transp. Co. v. United States, 574
> F.2d 926, 930 (7th Cir. 1978).

Hayman Cash Register Co. v. Sarokin, 669 F.2d 162 (3d Cir. 1982).

Having been assigned this case after the recusal of Judge Sleet, I am able to revisit this

previous ruling on the issue of venue transfer only under a reconsideration standard.

Reconsideration of an issue is appropriate where the party seeking reconsideration shows at least

one of the following grounds: (1) an intervening change in the controlling law; (2) the

availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent

manifest injustice. Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677

(3d Cir. 1999).

There has been no intervening change in the law, and there is no reason to parse Judge

Sleet's ruling because no error of law, let alone a "clear" error of law, was made. His conclusion

that Defendants had not established a need for transfer prior to May 29, 2014, properly applied

the Skilling test to the record before him. Nothing has been presented by Defendants that would

alter Judge Sleet's assessment that the District of Delaware has the appropriate size and characteristics to find an impartial jury. Judge Sleet's previous conclusion that there has been no direct media interference with this case also remains valid. Even if I might have weighed the pertinent factors differently (on which I express no opinion), I would lack the power to reach a contrary result.

Therefore, I focus my analysis on whether there is a change of circumstance because of media coverage since the earlier motions to transfer were denied. In making that determination, I will take into account the effect of publicity since Judge Sleet's May 29, 2014 order denying transfer, and assess that cumulatively with media attention focused on this case when that order was entered. Accordingly, the question I face is whether, under Skilling and other precedent, the publicity since the revelation of the "hit list," when added to the earlier media coverage, is enough to justify transfer.

Judge Sleet concluded that the media coverage of this case had been overwhelmingly factual, and after reviewing the subsequent articles and video submitted to the Court, I have determined that the coverage since the original order denying transfer follows in that vein. This is not a case where the "editorial artillery opened fire" on the Defendants. Sheppard v. Maxwell, 384 U.S. 333, 339 (1966). The article that is the centerpiece of Defendants' argument was not written in a way that would unduly prejudice prospective jurors. See Sean O'Sullivan, *Court Papers Show Matusiewicz 'hit list'*, THE NEWS JOURNAL, June 7, 2014, available at http://www.delawareonline.com/story/news/local/2014/06/06/sunday-preview-court-papers-show-matusiewicz-hit-list/10106577/. That article employs quotations denoting uncertainty as to whether the document is actually a "hit list" at all. Additionally, the article explained that the document was in fact abbreviated as "H.L.," and noted that prosecutors had declined to even

4

address whether that title stood for "hit list." The prosecution was judicious in its comments, and the article mostly recounts the positions of the Parties from public filings. Much of what is potentially prejudicial in the article will likely be evidence heard by the jury—evidence damaging to the Defendants' case but not inadmissible or *ad hominem* attacks by public media demonizing the individuals charged. There is a troubling quote from an unnamed attorney that he should "protect his safety," but such anonymous hearsay in the press can be addressed by appropriate instructions as to what constitutes proper evidence.

Judge Sleet also concluded that sufficient time had passed between the adverse coverage cited by Defendants and the projected commencement of trial, such that there would be a sufficient "cooling off" of any prejudice that may have resulted from that coverage. ECF 94 at 7-8. The May 29, 2014 memorandum and order make clear that media coverage had tapered off in the intervening period since the shootings took place. Although the new revelation caused renewed interest in the case, it cannot be presumed that the jury pool is tainted. The government has presented statistics that the paper circulation of *The News Journal*—116,645 subscribers—is a fraction of Delaware's population, and with respect to the paper's electronic reach, articles about the Matusiewicz case were not even among its "Top Ten" most read stories of the year. Furthermore, the trial in this case is scheduled to begin in June 2015. That date is one full year after the purported "hit list" was revealed, two years and four months after the shooting itself took place, and just under two years after the indictment was handed down. I have reviewed the other articles that make reference to the case since Judge Sleet issued his order denying a transfer of venue and once again conclude that the coverage is factual in nature.

In practical terms, Defendants bear a heavy burden when asserting a presumed prejudice theory. The Supreme Court in <u>Skilling</u> described the doctrine as having a limited scope:

> In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process." Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance*. A presumption of prejudice, our decisions indicate, attends only the extreme case.

Skilling, 561 U.S. at 380-81 (citations omitted). The Third Circuit has stated that "[t]he community and media reaction, . . . must have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." Rock v. Zimmerman, 959 F.2d 1237 (3d Cir. 1992) (citing United States v. De Peri, 778 F.2d 963, 972 (3d Cir. 1985)). Judge Sleet determined that the coverage preceding his order was not sufficient to support a presumption of prejudice, and the cumulative effect of the additional coverage surrounding the purported "hit list" is also not sufficient to support such a presumption.

In their brief and at argument, Defendants place particular emphasis upon United States v. Gordon, 380 F. Supp. 2d 356 (D. Del. 2005), rev'd on other grounds, 183 Fed. App'x 203 (3d Cir. 2006), in that it was a prosecution involving a public official that originated in Delaware, but was transferred to another district because of pretrial publicity. Even ignoring various distinguishing features of that case, Gordon was decided prior to Skilling, which sets a dauntingly high bar for a defendant seeking transfer.[2] The defense further points out that it is not just new coverage of the case that is potentially problematic, but also the re-posting of earlier articles and videos, and, in particular, television news accounts, that can recirculate rapidly and potentially affect the jury pool.[3] Once again, under Skilling, prejudice is not to be presumed.

---

[2] Jordan Gross, *If Skilling Can't Get a Change of Venue, Who Can: Salvaging Common Law Implied Bias Principles from the Wreckage of the Constitutional Pretrial Publicity Standard,* 85 TEMP. L. REV. 575 (2012).

[3] See Gary A. Hengstler, *Sheppard v. Maxwell Revisted—Do the Traditional Rules Work for Nontraditional Media,* 71 LAW & CONTEMP. PROBS. 171-180 (2008), available at http://scholarship.law.duke.edu/lcp/vol71/iss4/9.

6

Defendants are correct that the Court may properly consider the overall impact that a particular crime has on a community as it relates to the ability to secure a fair trial. The Fifth Circuit explicitly engaged in such an analysis in United States v. Skilling, 554 F.3d 529, 560 (5th Cir. 2009), when it criticized the District Court for overlooking the fact that "prejudice came from more than just pretrial media publicity," which it categorized as "non-media prejudice." Indeed, such community impact was at the center of Justice Sotomayor's dissent. 561 U.S. at 433. That said, a majority of the Supreme Court ruled that the trial was properly held in Houston despite the Circuit Court's observation that one-third of all Houstonians "personally knew someone harmed by what happened at Enron." 554 F.3d at 560 n.47. I am bound by that majority notwithstanding the persuasiveness of Justice Sotomayor's dissent.

Non-media prejudice was explicitly addressed in the Oklahoma City Bombing case, where the court observed that "[t]he effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary." United States v. McVeigh, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996). Here, as unsettling as the murder of Christine Belford was, thankfully it did not rise to the level of mass murder and widespread physical devastation that occurred in Oklahoma City. Moreover, McVeigh must be read in light of Skilling, where direct personal impact spread across a large percentage of the population of Houston was deemed insufficient to support transfer.

It might seem anomalous to hold that, where all judges sitting in the District of Delaware have recused themselves, a jury of Delaware citizens should be impaneled to hear the matter. However, the rules governing recusal are designed to accomplish a different goal: preserving public confidence in the impartiality of the judiciary. That has been accomplished by re-assignment of the case to a judge outside Delaware. Every crime occurs somewhere, and in a

7

criminal case the court must take pains during *voir dire* to ensure that none of the circumstances surrounding the offense will preclude a juror from deciding the case fairly on the evidence and the law.

Denial of Defendants' renewed motions is without prejudice, should later developments further call into question the ability to choose a fair and impartial jury in Delaware. A motion to transfer can be renewed even as late as jury selection, should the ability to select a fair jury through *voir dire* be in doubt.[4] The government strenuously opposes any further continuances. As it was cautioned during oral argument on these motions, should its confidence in the Parties' ability to select an impartial jury in Delaware be misplaced, it runs the risk that trial could be delayed, because the Defendants' Sixth Amendment right to a fair jury is paramount.

With that qualification, an Order denying transfer will be entered.

United States District Court Judge

---

[4] In the Fifth Circuit, where <u>Skilling</u> was decided, the preferred practice is to defer ruling on a motion to transfer until the Court has attempted to find an impartial panel through rigorous questioning of the venire. 554 F.3d at 560, n.40.